IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO. 5:12-cv-00004-RLV-DSC

| | |
|---|---|
| MICHAEL GODBEY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) MEMORANDUM AND ORDER |
| IREDELL MEMORIAL HOSPITAL, INC., | ) ) ) |
| Defendant. | ) ) |

**THIS MATTER** is before the Court on Defendant Iredell Memorial Hospital, Inc.'s Motion for Summary Judgment. (Doc. 29.)

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Godbey, who has been deaf since birth, brought this disability-discrimination action on January 20, 2012, alleging that Defendant Iredell Memorial, located in Statesville, North Carolina, failed "to provide interpreter services to ensure effective communication with him during each of his medical visits." (Doc. 1 at 1.) Plaintiff asserts that this lack of effective communication violates title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12181 *et seq.*, and section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794. Plaintiff seeks injunctive relief reforming Defendant's policies and procedures, as well as compensatory damages, attorneys' fees, and costs.

Defendant maintains a policy entitled "Communicating with Patients Who Are: Hearing Impaired, Speech Impaired, Limited English Proficient Individual," which was in effect at the time of Plaintiff's visits to Iredell Memorial. (Doc. 29-2 at 3, 10–14.) Pursuant to this policy,

> [i]n those situations where written communications, the use of picture boards, and/or family members with sign language skills do not meet the needs of

1

deaf/<u>mute</u> patients, the hospital will <u>seek</u> to provide sign language translation services.

(*Id.* at 12.) The policy, last updated in March of 2006, goes on to include the contact information of one sign-language translator in Statesville, who may be contacted "[i]f necessary" by the hospital's Nursing Supervisor or Administrator-on-Call. (*Id.* at 10, 12.) Defendant has established that access to sign-language interpreters located in Statesville is limited, and from 2010 through 2012, it has utilized sign-language interpreters residing elsewhere twenty-six times across six different patients. (*Id.* at 4–5.)

In April of 2012, and after the Complaint was filed, Defendant enhanced its communicative services for the deaf, contracting with "Deaf Talk" to provide video remote interpreting ("VRI") services and other auxiliary aids for hearing- or speech-impaired patients or family members. (*Id.* at 3.) In addition to these VRI services, Iredell issued a revised policy, entitled "Communication Services: Interpreter and/or Translator." (*Id.* at 16–18.)

Rather than providing a qualified interpreter of American Sign Language, Defendant, during the course of Plaintiff's several visits,[1] instead attempted to communicate with Plaintiff through written notes;[2] the signing abilities of its nursing staff, which Plaintiff's expert has deemed to be poor; and Plaintiff's mother, who is able to hear but whose knowledge of ASL is allegedly somewhat limited. (Doc. 1 at 3–4, 8.) Alleging these forms of communication to have been inadequate, Plaintiff claims he "was unable to participate fully in the decision-making process with respect to his own health." (*Id.* at 3.)

---

[1] The visits here at issue took place on March 19, 2010; August 17, 2010; August 23, 2010; September 29, 2010; October 10–12, 2010; and January 17, 2011.

[2] Plaintiff asserts that such notes "did not result in effective communication because [he] does not have a strong command of the English language" and because of his difficulty writing responsive notes due to a shoulder injury. (Doc. 1 at 4.)

The summary-judgment record, viewed in the light most favorable to Plaintiff, establishes that he is fluent in American Sign Language ("ASL") but that his command of the English language is somewhat limited.[3] "ASL is a fully developed, natural language" and is "one of the world's many signed languages. It is not a derivative of English; ASL contains structures and processes that English does not . . . ."[4] Sherman Wilcox & Phyllis Perrin Wilcox, *Learning to See: Teaching American Sign Language As a Second Language* 6 (2d ed. 1997). It is against this backdrop that Plaintiff entered Iredell Memorial on several occasions in 2010 and 2011.

On March 19, 2010, Plaintiff was transported to Iredell Memorial's emergency department while in police custody.[5] Plaintiff allegedly directed a request to the police that he be provided a sign-language interpreter. There is no evidence that this request was relayed to hospital personnel, and Plaintiff made no independent request of any hospital staff. (Doc. 37-1 at 9.) Moreover, Plaintiff has testified that he did not tell any hospital employee that he cannot read

---

[3] Regarding Plaintiff's educational background, he obtained a certificate of completion from the North Carolina School for the Deaf in 1995 and thereafter attended two community colleges within North Carolina, at which he communicated through an interpreter, but earned no degree. (Doc. 37-1 at 4.) Though not fluent in English, Plaintiff's familiarity with the language enabled him to write in shorthand the following in response to written notes from Iredell Memorial staff inquiring as to whether he was in pain: "I was in pain. I took pain killer . . . an hr before I got here. I was here due pain from wound/inflection [sic]." (Doc. 29-3 at 23.) He further noted, "I got a shot and a note for . . . med. . . . It getting worse." (Doc. 30-1 at 48.) "Inflection must be spreading." (Doc. 29-3 at 23.)

[4] The available literature on the subject of language development of deaf individuals is replete with mention of a plateau phenomenon regarding the reading abilities of children and adolescents who are deaf or hard of hearing:

> [Although i]t is not an easy task to provide estimates of the reading levels of students who are deaf or hard of hearing . . . [, r]egardless of the types of standardized tests used, [one of the ]general findings associated with the national surveys[ is that] the overwhelming majority of children with severe to profound impairment, upon [completion of their mandatory school period], do not read above the fourth-grade level when compared with peers who are typically hearing . . . .

Peter V. Paul, *Language and Deafness* 284 (4th ed. 2009); *accord* Kimberly A. Wolbers & Hannah M. Dostal, *Interventions for the Deaf and Language Delayed*, *in Handbook of Reading Disability Research* 392, 392 (Anne McGill-Franzen & Richard L. Allington eds., 2011). Nearly ten million Americans are hard of hearing, and almost one million are functionally deaf. Ross E. Mitchell, *How Many Deaf People Are There in the United States? Estimates from the Survey of Income and Program Participation*, 11 J. Deaf Stud. & Deaf Educ. 112, 112 (2006).

[5] After having been arrested for trespassing and damaging personal property, Plaintiff complained about knee and shoulder pain.

English very well, and he signed a discharge-instruction form, which stated in part, "I have received this information and my questions have been answered. I have discussed any challenges I see with this plan with the nurse or physician." (*Id.* at 11–12; Doc. 30-1 at 46.)

On August 23, 2010, Plaintiff went to Iredell Memorial for outpatient surgery on his shoulder.[6] Plaintiff did not request an interpreter. (Doc. 37-1 at 15.) Because of his shoulder injury, Plaintiff was unable to sign effectively and found writing with his right hand to be difficult; after the surgery, writing with his right hand was allegedly impossible, and Plaintiff alleges he is unable to write with his left hand. (*Id.*) Plaintiff could not recall during his deposition testimony whether he had expressed to anyone at Iredell Memorial that he was unable to communicate effectively, and he did not express to Defendant his displeasure with the quality of his communication with hospital staff. (*Id.*)

On September 29, 2010, Plaintiff returned to Iredell Memorial for outpatient knee surgery. Plaintiff testified that he could not recall whether he had requested an interpreter on that occasion. (*Id.* at 16.)

Regarding Plaintiff's October visit, an interpreter was requested by Plaintiff's mother, Ms. Mickelson. (*Id.* at 20; Doc. 37-12 at 6.) Following a forty-minute delay, Ms. Mickelson became disorderly and was arrested. (Doc. 37-12 at 8–10.) Hospital staff could not locate the list of interpreters, and Angie Shaw, a registered nurse at Iredell Memorial and mother to a deaf child, was summoned to work to interpret for Plaintiff. Although Ms. Shaw did not use ASL and instead only "fingerspelled" words in English (Doc. 37-1 at 22), Plaintiff did not notify Ms. Shaw or other hospital staff that Ms. Shaw's communication was ineffective (*Id.* at 24). Plaintiff

---

[6] On August 17, Plaintiff had a pre-operative office visit with Dr. Dunaway, an orthopedic surgeon who operates his own office but has surgical privileges at Iredell Memorial. (Doc. 43-1 at 2.) Plaintiff claims to have communicated to Dr. Dunaway's staff that an interpreter was needed. (Doc. 37-1 at 18.)

did not subsequently request another interpreter through the duration of this visit. (*Id.* at 26.) Ms. Shaw thereafter lodged a complaint with the hospital's Assistant Director.

Finally, in January of 2011, Plaintiff visited Iredell Memorial's emergency room. He submitted a written request for an interpreter. (*Id.* at 28.) Again, the interpreter was able only to fingerspell, but Plaintiff did not sign or write to the interpreter or any hospital staff member that he could not understand the interpreter. (*Id.*) However, Plaintiff alleges that from his facial expressions it was clear to the staff that he did not understand what was being discussed. (*Id.* at 29.)

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial responsibility of informing the district court of the basis for its motion and identifying those particular portions of the record before the Court that the movant believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In the event this burden is met, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 322 n.3. Thus, the nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. Rather, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a motion for summary judgment, the Court must view the evidence and any reasonable inferences arising therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Nevertheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III. DISCUSSION

A. Statutory Standards

Plaintiff has asserted that Defendant's denial of interpretive services constituted intentional discrimination "on the basis of disability by denying Plaintiff auxiliary aids and services necessary to ensure effective communication . . . , equal access, and an equal opportunity to participate in and benefit from Defendant's health care services," in violation of the RA and the ADA.[7] (Doc. 1 at 11.)

Title III of the ADA applies to privately operated public accommodations, including hospitals, and prohibits discrimination "on the basis of disability in the full and equal employment of goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(a); 42 U.S.C. § 12181(7)(f) (defining hospitals as public accommodations). Such discrimination includes the

---

[7] The RA and the ADA are similar in substance and generally are construed to impose the same requirements. *See* 29 U.S.C. § 794(d) (incorporating the standards applied under title I of the ADA); *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468–69 (4th Cir. 1999) (noting that the standards to be applied are generally but not always the same). Although the statutes' causation requirements differ in that the ADA proscribes discrimination by reason of disability whereas the RA premises liability only in discrimination that was *solely* by reason of a person's disability, "[w]here a claim is based on the failure to provide reasonable accommodations, the ADA and RA are identical in scope." *McCoy v. Tex. Dep't of Criminal Justice*, No. 05-370, 2006 WL 2331055, at *5 (S.D. Tex. Aug. 9, 2006) (discussing *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 455 (5th Cir. 2005), the reasoning of which, although directly addressing title II of the ADA, applies equally to title III).

6

> failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, . . . or would result in an undue burden . . . .

*Id.* § 12182(b)(2)(A)(iii). A Department of Justice ("DOJ") regulation implementing title III further provides that "a public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c).

Although title III does not allow a private party to seek damages, it does provide for injunctive relief. 42 U.S.C. § 12188(b)(2); *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 304 (1st Cir. 2003); *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1136 (9th Cir. 2002); *Gillespie v. Dimensions Health Corp.*, 369 F. Supp. 2d 636, 640 (D. Md. 2005). To establish standing for such relief, a plaintiff must first demonstrate, among other things, that he will suffer an injury in fact which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Regarding an "injury in fact," the Supreme Court has explained that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). In *Lyons*, the Court held that a plaintiff who had been subjected to a "chokehold" by the Los Angeles police would have had to allege not only that he would have another encounter with the police, but that he was likely to suffer similar injury during that encounter in order to obtain injunctive relief. *Lyons*, 461 U.S. at 105–06. "Absent a sufficient likelihood that he will again be wronged in a similar way," the Court stated, "Lyons is no more entitled to an injunction than any other citizen

7

of Los Angeles." *Id.* at 111. A plaintiff must thus allege a future encounter with the defendant that is likely to lead to a similar violation of some protected right.

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). To sustain a claim for monetary damages pursuant to the RA, a plaintiff must show that (1) she has a qualifying disability, (2) she is otherwise qualified for the service being sought, (3) she was excluded from the service solely by reason of her disability, and (4) the service exists as part of a program or activity receiving federal financial assistance. 29 U.S.C. § 794; *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 826 (D. Md. 1998) (citing *Doe v. Univ. of Md.*, 50 F.3d 1261, 1265 (4th Cir. 1995)). In order to satisfy the third requirement, the only requirement here contested, a plaintiff seeking compensatory damages must show that the administrator of the program intentionally discriminated against the handicapped person. *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 & n.9 (4th Cir. 1994) (treating the "intentional discrimination" required to support an award of damages under the Rehabilitation Act as synonymous with discrimination resulting in "disparate treatment," not discriminatory animus). However, the Fourth Circuit has not yet determined what standard of proof a plaintiff must meet to demonstrate discriminatory intent under the RA. The parties have here offered two competing standards.

Plaintiff argues that "deliberate indifference" is the appropriate standard for defining discriminatory intent, and many circuits have so concluded. *See, e.g.*, *Liese v. Indian River County Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2008); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir.

2001); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999); *see also Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) ("The district court decided that deliberate indifference was the appropriate standard for showing intentional discrimination in this type of case. . . . [W]e agree."). *But see Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 575 (5th Cir. 2002) (rejecting the deliberate-indifference standard). In *Liese*, the Eleventh Circuit took note of *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), in which the Supreme Court held that a plaintiff suing for money damages under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, must demonstrate discriminatory intent, which may in turn be established by showing deliberate indifference. Noting the similarities between Title IX and the RA, the court in *Leise* held that because the purposes of Title IX as outlined in *Gebser* apply to the RA; the RA's legislative history shows that Congress intended for the RA to combat intentional discrimination in general, not just discrimination resulting from "invidious animus"; and the RA was similarly enacted pursuant to Congress's Spending Clause power, the deliberate-indifference standard best reflects the purposes of the RA while unambiguously providing the notice-and-opportunity requirements of Spending Clause legislation. *Liese*, 701 F.3d at 348.

Defendant would have Court use the "bad faith or gross misjudgment" standard applied by the Eighth Circuit in *M.P. ex rel. K. v. Independent School District No. 721*, 439 F.3d 865 (8th Cir. 2006), citing in support the Fourth Circuit's ruling in *Sellers by Sellers v. School Board of Manassas, Virginia*, 141 F.3d 524 (4th Cir. 1998). (Doc. 31 at 14.) In *Sellers*, the Fourth Circuit held "that either bad faith or gross misjudgment should be shown before a § 504 violation can be made out, *at least in the context of education of handicapped children.*" *Sellers*, 141 F.3d at 528 (quoting *Monahan v. Nebraska*, 687 F.2d 1164, 1170 (8th Cir. 1982)) (emphasis added).

9

The high standard applied in *Monahan*, which was crafted with an eye to the court's "duty to harmonize the Rehabilitation Act and the [Education for All Handicapped Children Act of 1975 ("EAHCA"), now codified as the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*,] to the fullest extent possible, and to give each of these statutes the full play intended by Congress."[8] *Monahan*, 687 F.2d at 1171. As the court noted, a "bad faith or gross misjudgment" standard "reflects what we believe to be a proper balance between the rights of handicapped children, the responsibilities of state educational officials, and the competence of courts to make judgments in technical fields." *Id.* In the educational context, then, state officials may not be held liable so long as they "have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals." *Id.*

However, the cases to which Defendant cites in support of the application of this "bad faith or gross misjudgment" standard were decided in the context of whether a school violates the RA by failing to meet the requirement of IDEA (or its predecessor, the EAHCA) to provide a free, appropriate public education. In fact, the cases expressly state the "bad faith and gross misjudgment" requirement as applicable "in the context of education of handicapped children." *Sellers*, 141 F.3d at 529 (quoting *Monahan*, 687 F.2d at 1171). This additional element is required in the educational context to distinguish an IDEA violation for failing to provide a free, appropriate public education, which does not require bad faith or gross misjudgment and which cannot result in the imposition of monetary damages, from a Rehabilitation Act violation for the

---

[8] The IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination. "That a court may . . . come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required under [the IDEA], is not necessarily the same thing as a holding that a [disabled] child has been discriminated against solely by reason of his or her [disability]." *Monahan*, 687 F.2d at 1170–71. "Therefore, something more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities, i.e., a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment." *Wenger v. Canastota Cent. Sch. Dist.*, 979 F. Supp. 147, 152 (N.D.N.Y. 1997) (citation omitted).

same failure. *Id.* at 527. Defendant has cited no cases requiring bad faith or gross misjudgment in any other context, and the Court sees no reason to extend this augmented standard beyond the context of a plaintiff's challenge to a school's provision of a free and appropriate public education as required by IDEA. Accordingly, the deliberate-indifference standard shall be applied in this case.

Defendant does not contest that the ADA and RA require that it provide deaf and hearing- or speech-impaired patients with effective communication. (Doc. 29 at 2); *see also* 45 C.F.R. § 84.52(c) ("A recipient hospital that provides health services or benefits shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care."). However, the auxiliary aids and services necessary to ensure effective communication are context-specific. *Cf.* 28 C.F.R. § 36.303(c)(1)(ii) (noting that such aid or service "will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place"). While qualified sign-language interpreters may be the only effective communication option for some, there is no per se rule that such interpreters are necessary, and other accommodations are often sufficient.[9] *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 208 (1982) (holding that sign-language interpreters are not required when lip reading, or by extension other accommodations, are sufficient); *Proctor*, 32 F. Supp. 2d at 827 (noting that neither the case law nor the regulations establish a per se rule that sign-language interpreters

---

[9] Auxiliary aids are defined in the ADA regulation to include the following:
Qualified interpreters, notetakers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunication devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments.

28 C.F.R. § 35.104.

are necessary in hospital settings). And while the DOJ regulations appropriately advise that a public accommodation "should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, . . . the ultimate decision as to what measures to take rests with the public accommodation," so long as the communication that results is effective. 28 C.F.R. § 36.303(c)(1)(ii). Indeed, "[t]he auxiliary aid requirement is a flexible one." *Feldman v. Pro Football, Inc.*, 419 Fed. App'x 381, 392 (4th Cir. 2011) (quoting 28 C.F.R. pt. 36, app. C).[10] Moreover, "'full and equal enjoyment' is not so capacious as to 'mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability.'"[11] *Id.*

In light of Plaintiff's limited English proficiency and Defendant's choice of communicative methods, a genuine issue of fact has been presented as to multiple instances of Defendant's failure to communicate effectively with Plaintiff. (*See, e.g.*, Doc. 30-2 at 2) (noting, within an emergency department report, that during Plaintiff's March 19 visit, a "REVIEW OF SYSTEMS" proved "[d]ifficult due to the patient's deafness" and that "[e]ight systems ha[d] been attempted"); (Doc. 30-1 at 52) (remarking that the hospital staff member "may need 4 eyes to catch up w/ fast sign lang."); *see also* (Doc. 38 at 2) (noting, within a patient-assessment form, that Plaintiff's cognitive or perceptual pattern was within normal limits but highlighting a box labeled "ineffective communication" with the written explanation "deaf"). However, in evaluating Defendant's efforts to ensure effective communication, qualifying defendants are not

---

[10] The ADA regulations acknowledge that, while consultation with persons with disabilities is expected, "Congress did not intend under title III to impose upon a public accommodation the requirement that it give primary consideration to the request of the individual with a disability." 28 C.F.R. pt. 36, app. C.

[11] RA regulations promulgated by the Department of Health and Human Services similarly provide for a variety of auxiliary aids, 45 C.F.R. § 84.52(d), which "are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result[ or] to gain the same benefit . . . ." *Id.* § 84.4(b)(2).

required as a matter of course to provide ASL interpreters, and such defendants are not required "to guess" a plaintiff's need for reasonable accommodations. *See, e.g.*, *O'Neil v. Tex. Dep't of Criminal Justice*, 804 F. Supp. 2d 532, 538 (N.D. Tex. 2011). A deaf patient may obviously have a strong command of the English language—and would be able to participate adequately in his or her own treatment through the use of written notes, for instance—or may use one of many different sign languages, ASL being by no means universal. (*See* Doc. 37-10 at 3–4) (distinguishing ASL from Pidgin Signed English and Signed Exact English). Here complicating Plaintiff's requests for relief is his perceived entitlement to an ASL interpreter merely upon providing hospital staff with notice of his deafness. (*See, e.g.*, Doc. 37-1 at 11) ("Q. Did you tell any of the hospital staff that you couldn't read English very well? A. No. They knew I was deaf."); (*id.* at 16) ("Q. Mr. Godbey, how do you think the hospital knew you needed an interpreter? A. My parents told them I'm deaf. . . . It's put down, you know, when I point to my ears and shake my head no. Q. Mr. Godbey, isn't it true that some deaf people communicate by writing? A. Some deaf people, yes. Q. Do you think the hospital knew that you couldn't communicate by writing? A. I don't know."); (*id.* at 17) ("[T]hey knew that I was deaf, and they didn't offer me an interpreter . . . ."); (*id.* at 20) ("They knew I was deaf. They knew it was their responsibility to provide one.").[12] Although Plaintiff requested and received an interpreter during a visit to Iredell Memorial in 2007, Plaintiff made remarkably little effort to put hospital staff on notice of their alleged communicative deficiencies during the visits here at issue. (*See, e.g.*, *id.* at 20.)

Defendant's failure to provide ASL-fluent interpreters here does not by itself suffice to maintain Plaintiff's claim of intentional discrimination. Although a qualifying defendant may

---

[12] This sentiment is likewise found in Plaintiff's Memorandum in Opposition. (*See, e.g.*, Doc. 36 at 19–20) ("[T]he hospital knew he needed an interpreter because his parents told them he was deaf.").

readily be shown as deliberately indifferent to the likely violation of protected rights by not responding to a patient's known disability and apparent need for an accommodation, even without the asking, where reasonable accommodations were made and in the absence of information indicating that such accommodations would fall short in ensuring effective communication, there is no intentional discrimination. Therefore, although Defendant may have overestimated Plaintiff's command of English, it cannot be held liable for monetary damages under the Rehabilitation Act.

In addition, injunctive relief is inappropriate in this case. Plaintiff, a resident of Statesville, having remained in close proximity to Defendant Iredell Memorial, has established a reasonable likelihood of readmission to Iredell Memorial. (Doc. 37-1 at 29) (establishing residence and distance). However, Defendant has here amended its policy of providing translation services in ways adequate to prevent a recurrence of the alleged violation, namely, by having qualified interpreters more readily available, and there is no indication that Defendant will render unavailable its VRI services upon this case's conclusion. Accordingly, there being no reasonable expectation for the challenged conduct to start up again, Plaintiff's request for injunctive relief is moot. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment (Doc. 29) be **GRANTED**. Plaintiff's claims are hereby dismissed.

Signed: August 19, 2013

Richard L. Voorhees
United States District Judge